Good morning, Your Honors. May it please the Court, my name is James C. Angleton and I represent Ms. Sauditou Seyoum. In her culture, she is formally addressed as Ms. Sauditou, and she is here in the Court in the back. I respectfully request three minutes for rebuttal time. Okay, we'll try to help you, but if you can help, try to keep track of your time. Certainly, Your Honor. We respectfully request a remand, because I will show during this opening, first, the IJ would not consider Ms. Sauditou's claim that making a citizen stateless constitutes persecution, and that Ethiopia's making her stateless constituted persecution of her. Second, the IJ would not consider Ms. Sauditou's claim that Ethiopia's process of making her stateless constituted persecution. And third, the IJ would not consider her statelessness, her post-traumatic stress disorder, and major To elaborate on the first point, the world order is based on state sovereignty. Could you just give us a narrative as to precisely what happened to your client? Yes, Your Honor. The war between Ethiopia and Eritrea broke out in May 1998. At that time, she was working for CIRA, which was an immigration refugee affairs authority. It's a government position in Ethiopia. She had worked there for 18 years. In early June, she was fired from her job because her parents were both born in Eritrea. She was about the first person fired from that government job. And do we have any adverse credibility findings? If that's your testimony, and we take that as true. The IJ found her credible and found all the witnesses credible. So whatever she says and all the reasonable inferences are to be taken as true. Right, okay. So she's fired from her job, and then what happens? Okay, she was fired from her job in early June. In mid-August, her husband was poisoned and died because of this, and the police At least you think so. Because Oh, the autopsy indicated she was poisoned. He was poisoned. I know, but the because of? Well, it was what we speculate, or I believe, that the authorities murdered him. That was her belief. That's her belief, too. Yeah, sure. Yeah, it doesn't matter what we believe, but it does matter what she believes. That's right. That's her belief. Right. And what I think is very important And was he Eritrean himself? Pardon me? Was he himself Eritrean? Yes, Your Honor. He was. He was born in Eritrea, and he worked in farm Africa, and he had criticized the policy of the deportations. And he had worked, he was working in Tigray, which is the most xenophobic, anti-Eritrean area of Ethiopia. Okay. Then the thing that's very disturbing is that the authorities refused to investigate. They did determine that there was poisoning, but they refused. She went to the hospital. The normal procedure was for the hospital to release the autopsy report the next day. They would not take the body. They told her to see the police. The police would not investigate either. They told her to get away. She came by three times. Each time, they would not investigate. To us, this is evidence of statelessness. I mean, in Trump versus Dulles, the main point is that making a person stateless robs them of their dignity. And then she's arrested some days after her husband's death. Yes, she's arrested 10 days later, Your Honor, at 5 o'clock in the morning when she was at home, and she had just gotten to sleep. She was cradling her child, Solomon, who was a two-year-old baby at that time. And the maid said, you know, you better smoke her up. You better come to the door. These people came barging in. They reprimanded her for not opening the door fast enough and slapped her and knocked her unconscious. And she says, they may have slapped me some more. They poured some water on her. They accused her of giving money and information to Eritrea. And she was taken to a police station for one day and then to a holding center, which was holding women and children for deportation to Eritrea. Now, was her child with her at that time? No, Your Honor. This was an intentional policy of the Ethiopian government, was to separate the families of the so-called Eritreans. It was this way of inflicting emotional distress on them, hardship on them. Mr. Angleton, this is Silverman. Suppose we agree with you that what you describe constitutes past persecution, contrary to what the immigration judge found. What do we do then? Are you entitled to, you started off by saying you wanted a remand. Do you want further proceedings, or is there any need for a remand? What's your position on that? If we could get asylum without the statelessness claim, we would like to get asylum without the statelessness claim. Because also, the case I just submitted to DESE indicates that persecution is still going on in Ethiopia on account of a person's, one family member's birth, I'm sorry, parent's birth in Eritrea. And this was decided by the Seventh Circuit last Monday, Monday I believe. And she had come back in 2007, she came to the airport to find out and investigate what had happened to her family. And she was abused and she was gang raped. And then they told her to get out of the country. Yeah, this is the woman in the Seventh Circuit case. Yes, Your Honor. So let me follow up on Judge Silverman's question. If we were to find that there has been past persecution, thereby raising the presumption in favor of your client, do we need to remand? Or do we simply remand for exercise of discretion? Well, I would. Exercise discretion as to whether to grant asylum. I think that the IJ, I mean, there'd be no need to remand because the country conditions have already been considered by the IJ. And so therefore, we don't, he's already done this. So there's not any reason for that. And if the court does not want to look at the statelessness issue, but look at just what had happened to Ms. Zaldito, I think that we could be able to get asylum. I think that also with Lolong and in the past persecution, she has a well-founded fear of persecution. Where is the child at this time? Solomon is now with Ms. Zaldito. Here in the United States, awaiting the decision on this case? Yes, Your Honor. And what happened there was that during her two-week detention in the Jelmeda Detention Center, which was for deportation to Eritrea, she was put in with 300 to 400 ladies and children. And there were no bathroom facilities. This was the same thing that happened in Nome. This is part, I believe, of this attack on the dignity of a person when they are divested of their citizenship. This is what Trott v. Bellis emphasizes, says that making a person stateless is a cruel and unusual punishment. And the IJ said that she had said that she was not treated poorly, but she had never said that. She described it as a place that boggles the mind. And she said that the deliberate separation of her from Solomon was something that she could not believe, living without her child. She said that they had fired me from my job, I lost my job, I lost my husband, now I'm going to lose my child? I told them I could not live without my child. They said, there's no problem. She said, they were so vicious, I was sick. Okay, now you wanted to save some time. You're down to two minutes. Shall we hear from the government and then give you a chance to respond? Good morning, Your Honors. My name is Erin Grace, and I represent the government. Largely what Mr. or what Ms. Sayoum had predicated her claim on was that she- I think her name or profession- They do too, I'm sorry, yes. I apologize. That's all right. Predicated her claim for asylum with holding a cat was on the fact that she was Eritrean and that she was considered Eritrean because her parents, while they had been born in Ethiopia, it was now part of Eritrea, the city called Asmara. The immigration judge looked at the fact whether or not she was, in fact, she could be considered Eritrean. He looked at her own expert testimony, her testimony, and the documents that she presented. Her own expert testimony, or her expert, did not testify that she was, in fact, Eritrean. He said, there are three ways you can determine if one is Eritrean. One is birth records, one is self-identification, and one is parentage. And in this case, there were no birth records to support Ms. Sayoum's heritage or race, but her son's birth certificate said that he was Ethiopian. Her other official document said that she was Ethiopian. She identified herself as Ethiopian. She testified that she had never participated in the 1993 independence referendum on Eritrean independence, which the government of Ethiopia considered that a determinative factor of whether one is Eritrean. If you voted for that, they considered you to be Eritrean. I don't, excuse me, I don't understand the significance of what you're telling us. Considering that they arrested her and put her in a detention camp and threatened to deport her. Because when they jailed her, it was at a time of turmoil. They said, she claims that they arrested her because she was Eritrean. The court found that she was not Eritrean after looking at, you know, the substantial evidence presented in this case. But even if you assume that she was Eritrean for this argument, you would have to also look at whether or not the jailing of her was persecution. And persecution, you know, is an extreme concept. It's a difficult thing to prove and you would look at the whole facts of what happened. Looking at the facts of what happened when she was jailed, yes, she was taken out of her house early in the morning and separated from her son. But she was not deported to Eritrea at a time when many other people were. Most other Eritreans were. She says that they rounded up Ethiopians like herself and other Eritreans. She doesn't know what happened to some of these people, presumes that they were deported. But she was not deported, nor was she stripped of her passport, which many Eritreans were stripped of their passport and were subsequently deported. She apparently got out of this by bribing her way out. Yeah, that is her contention. But nevertheless, that is her statement that she was. And do we have an adverse credibility finding? No, we do not. So you can't say contention. That is her testimony and we believe that. That is her testimony that she was. And we believe that. And we believe that, yes. That her testimony was that she was released because of a bribe. I just re-read the IJ's report. Could you point me in the IJ's decision where he says that she's not Eritrean? In, let's see, I do have it here. Closest I see is the top of page seven, yeah. That's page seven. Let's see. The respondent has not provided documentation that would show that she is in fact ethnic Eritrean. And then he goes through the list of factors that her expert said would identify one as Eritrean. Additionally, she did testify that her mother remained in Ethiopia until she died, which was in late December 2000. So her mother, who the claim sort of falls from the fact that her mother was born in what was now considered Eritrea, her mother went back. There's no testimony to suggest that her mother was persecuted. Could you show me where the IJ concludes that she's not Eritrean? I'm on page 45 of the administrative record. Well, on page seven of his, he says the respondent has not provided any documentation that she would show that she is in fact an ethnic Eritrean. And what line are you on? I'm on line one, two, three, four. Okay. Three and four. And then he goes through. Dr. Taylor has asked specifically how one would tell if an individual was in fact Eritrean. Mentioned three points. One is birth records. In this case, the birth records do not indicate that respondent is in fact Eritrean. The second is by self-identification, which speaks for itself. The third would have been parentage. Right. Well, she self-identifies. As Ethiopian. Correct. Right. No, as Eritrean. She's testifying that she is being discriminated against because of the Eritrean birth of her parents. Well, she's test, but she says that she, in the testimony, she says that she is Ethiopian. Yes, of course. Right. But yes, she does say that she is. But the basis for the discrimination, according to her testimony, is the fact of her parents' birth in Asmara. Correct? That is correct. Okay. Right. But her mother remained in Ethiopia until she died. And I think that's an indicator that perhaps the government did not view her as, at least her mother, as Eritrean. Because her mother was able to remain in the country. There's no testimony to indicate that the mother was harmed at any time when she was in that country. Well, does that mean that this person has no claim at all, so long as there are any Eritreans living unharmed in Ethiopia? That can't quite be. No, I'm not saying that. But I am saying that, you know, it is some indicator of the ethnicity claim that she's making, that the government viewed her as Ethiopian rather than Eritrean. Yeah, I have to say I find it odd on this record, and even find it odd based upon what the IJ says. I don't read the IJ as saying she is not Eritrean for purposes of discrimination against her on that basis. I read the IJ as saying that the things that happened to her are not bad enough. Not that the basis for discrimination isn't there. Perhaps that's the correct reading of the immigration judge's findings. Yeah. But even if you look at that, even if she was persecuted or suffered some harm because she is Eritrean, he doesn't arrive at the conclusion based on the whole evidence or the record as a whole that this was persecution. He does look at the jailing of the time that she was persecuted and concludes from that that, yes, while she was jailed and was separated from her son, while that was, I mean, I guess he characterizes it as not treating her poorly. One might argue with that, but if you look at the case, she wasn't physically harmed while she was in jail. Was she physically harmed at 5 o'clock in the morning when she was taken from her apartment? Well, she said there was some contradictory evidence, but yes, she says that she was harmed. Come on. We are in a position where we have to believe her. She was saying that she was harmed, that they took her out of her house. No, I'm sorry, you have to say she testified and we believe that she was harmed. She testified and we believe that she was harmed when she left her home. Yes, although the harm may not have amounted to more than slapping. Yes, the harm may not have arose to the level of persecution. Suppose we disagree with the IJ's conclusion about whether it was sufficient to constitute persecution. Suppose we believe that it is past persecution. Where do we go from here? I think you would remand back to the immigration judge to conclude, based on the evidence, whether he should grant her asylum. As a matter of discretion? As a matter of discretion, yes. Got you. Okay, thank you. That is to say, if we were to conclude, I just want to make sure I understand your answer to Judge Silverman's question. If we were to conclude that she has shown past persecution and the presumption then kicks in, we don't need to remand for a finding as to the likelihood of further persecution. We remand for the exercise of discretion by the Attorney General whether to grant asylum. No, I think I may have misspoken. Because the test for asylum is whether she suffered persecution in the past and has a well-founded fear of persecution if she were to be returned to Ethiopia. Correct. The IJ did look at that in this matter and concluded that it's unlikely that she would suffer persecution if, in fact, she were to be returned. The facts that he looked at were the country report, which stated that there had been a cease-firing between the two countries, that deportations had stopped, that she was not deported. She was able to retain her Ethiopian passport. But that means that this wouldn't be a ventura remand for him to reach a question he didn't reach. That is to say, he's reached the question. Yes, he's reached the question. So, if we disagree... Right. Okay. I mean, yes. So, he did look at a well-founded fear of future persecution, even though he did not find past persecution. And as I said, relied on several factors and concluded from those factors that the country conditions had changed and that she was unlikely to suffer persecution if she were to be returned to Ethiopia. Okay. So, in sum, I would argue that the immigration judge and the Board of Immigration Appeals viewed the whole record, reviewed all of the testimony, the documents, the substantial evidence that was provided during this hearing and these hearings, and concluded that she had not met her burden of asylum, withholding, or the Convention Against Torture. Okay. Thank you. Thank you very much. Your timing is perfect. Thank you, Your Honors. May I please report? First of all, I'd like to point out what Professor Keller, the expert on Ethiopia, testified. He pointed out that an Eritrean is a social construct, at least to somebody like Ms. Zaldito. Otherwise, this war broke out. That Ethiopia is run by a minority government, the Tigrayans, and they had been very unpopular because they were accused of balkanizing Ethiopia when they allowed Eritrea to leave. And they introduced this ethnic federalism in Ethiopia. And so, by creating a hatred to the so-called Eritreans in Ethiopia, they were able to get the people behind him. That's what the expert said, and the IJ found him to be credible. Now, so the concept that it's not an ethnic concept. There's no such thing as an Eritrean race. There's no such thing as an Eritrean language. In Eritrea, people speak nine different languages. This is what Professor Keller pointed out. Now, the separation from the son is definitely persecution. It's emotional persecution. She testified that she was asked, were you tortured? She said, no. I suffered emotional torture. By that standard, any woman who happens to be a mother convicted of a crime and sentenced to incarceration is somebody who's a subject of persecution? Well, that would be the state performing a legitimate function. Here, she was arrested without a warrant. There was no taking her before a magistrate. I wouldn't go down the warrant road. The fact that some other country doesn't adhere to American legal standards doesn't constitute persecution. But she was arrested on account of race. And this is what the Haley court, it draws a parallel between what happened in Ethiopia and what the Nazis did in Nazi Germany. And that's why they say that the idea of citizenship stripping certainly is persecution. But since it had not been addressed by the administrative agencies, they had to remand it. But they cite books about Nazi Germany and the Jews in that opinion. OK, you're over time. And if you'd like to wrap it up, if you have a final thought, please. Yes. Anyway, the Holocaust and other examples of state persecution of unpopular minorities put Ms. Auditu's claim into perspective. She respectfully requested the court remand the case. All who can get asylum. Thank you, Your Honor. Thank both of you for your arguments. Case in the case. Caption. Is it me to versus say versus Gonzalez versus Gonzalez is now submitted for decision.
judges: Silverman, W. Fletcher, Clifton